## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-60432-CIV-SINGHAL

**JASON NUWER**, *et al.*,

      Plaintiffs,

v.

**FCA US LLC f/k/a**
**CHRYSLER GROUP LLC**,

      Defendant.

_____/

### PLAINTIFFS' MOTION TO COMPEL DEPOSITION AND FOR FEES, COSTS, AND SANCTIONS ARISING FROM DEFENDANT'S AND ITS COUNSEL'S FAILURE TO COMPLY WITH COURT ORDER

## INTRODUCTION

On August 7, 2023, this Court ordered FCA to "provide Class Counsel the VIN numbers for Class Vehicles and the mailing lists for the extended warranty for the Class Vehicles no later than August 15, 2023."  ECF No. 241. The Class Vehicles included both new and used Class vehicles sold by authorized dealerships before June 10, 2020.[1] As of the date of this motion, FCA still has not produced complete or accurate data to Plaintiffs' counsel.

FCA's counsel insisted for four months that FCA could not identify sales of used cars by authorized dealerships and, therefore, could not provide VINs for a significant subset of Class Vehicles. During the parties' November 28, 2023, conferral on motions *in limine*, Plaintiffs informed FCA that they would seek to exclude any reference at trial to the Class size or aggregate Class damages because the size of the Class could not yet be calculated.  Shortly thereafter, FCA suddenly realized that it did, in fact, have access to used car sales data and agreed to produce it. FCA's sudden realization came only after Plaintiffs—believing that they had no other option— issued subpoenas requesting the relevant data to 94 authorized FCA dealerships in Florida.

Plaintiffs also recently learned that FCA's original production of data for sales and leases of new Class Vehicles inexplicably failed to include any data on FCA's most

---

[1] The Court, on Plaintiffs' unopposed motion, has since narrowed the Class to include "[a]ll persons who purchased or leased, and as of September 27, 2023, still owned or leased, new or used Class Vehicles from FCA US LLC-authorized dealers in Florida between January 1, 2013, and June 10, 2020." ECF No. 264.

popular Class Vehicle, the Jeep Grand Cherokee, or any data reflecting sales and leases of Chrysler minivans. And even after FCA finally disclosed in December 2023 that it could access used Class Vehicle data, Plaintiffs discovered—through a careful review of the data produced by just four of the dealerships subpoenaed—that the data provided by FCA was ***still*** incomplete.[2] In fact, FCA's production omitted 172 Class Vehicles sold or leased by those four dealerships. Should those omissions in any way represent a pattern across the Florida dealerships, it is possible thousands of Class Vehicles have not yet been identified.

To determine the actual Class size and confirm the sufficiency of the broad notice issued to the Class, Plaintiffs move pursuant to Rule 23(d) to compel the deposition of FCA's data manager and any other employees responsible for collecting Class data responsive to the Court's August 7 Order. Plaintiffs also seek a declaration of their entitlement to the fees and costs they incurred due to FCA's and its counsel's dilatory conduct, and an order prohibiting FCA from introducing evidence of the Class size or aggregate damages at trial.

## **BACKGROUND**

On August 7, 2023, this Court ordered FCA to "provide Class Counsel the VIN numbers for Class Vehicles and the mailing lists for the extended warranty for the Class Vehicles no later than August 15, 2023."  ECF No. 241. The Class Vehicles

---

[2] Plaintiffs' counsel and the Court-appointed Claims Administrator in this case compared the list of VINs provided by the dealerships against each of the various spreadsheets provided by FCA and determined that the dealerships had records of sales of Class Vehicles that were not included in the data provided by FCA.

include both new Class Vehicles and used Class Vehicles sold or leased by authorized FCA dealerships before June 10, 2020. *Id.*

On August 11, 2023, FCA produced two spreadsheets, one listing original purchases and leases of new Class Vehicles in Florida (approximately 200,000 vehicles total) and the other purporting to reflect extended warranty mailings in Florida (approximately 176,000 vehicles listed). Declaration of Robert J. Neary, attached as **Exhibit A**, at ¶ 5. But those lists did not include data reflecting sales or leases of ***used*** Class Vehicles. *Id.* When Plaintiffs' counsel inquired about the omission of used Class Vehicles from the two lists, FCA's counsel represented that FCA could not identify used Class Vehicles sold by its authorized dealers and therefore could not provide the VIN numbers for those vehicles. *Id.* In response, Plaintiffs' counsel requested a list of all current owners of used vehicles, even if that list included owners who had not purchased their vehicles from authorized dealers. *Id.* ¶ 6.

Still maintaining that they could not provide a list of used sales by authorized dealerships, FCA's counsel directed Plaintiffs to a spreadsheet produced in discovery that purportedly included all VINs of vehicles sold nationwide with an AHR. *Id.* ¶ 7. The spreadsheet set forth data listing the state associated with each VIN, but did not indicate whether that referenced the state of purchase or the state of the owner's residence when the list was created. *Id.* After several inquiries, FCA's counsel explained that the list showed the state of the original sale. *Id.*

But FCA's response raised additional questions. The spreadsheet produced in

discovery listed more than 600,000 vehicles in Florida—at least 400,000 more than the previously produced spreadsheet showing approximately 200,000 such vehicles. *Id.* ¶ 8. After several weeks and additional inquiries about this discrepancy, FCA's counsel finally responded, representing that this larger list included Florida owners that had not purchased their vehicles in Florida—a contradiction of counsel's prior representation that the vehicle list "showed the state of original sale." *Id.*

Plaintiffs immediately requested clarification of the contradictory statements, but received no response until ***six weeks*** later, after indicating to FCA's counsel that Plaintiffs intended to file a motion to compel accurate Class data. *Id.* ¶ 9. Only then did FCA respond, representing that the list did not identify the state of the original sales, only the state in which the vehicle was registered. *Id.* This representation raised yet another discrepancy: the latest spreadsheet included approximately 425,000 more vehicles than the extended warranty spreadsheet (which should have also been a listing of all Florida-registered vehicles with AHRs). *Id.* ¶ 10.

When questioned about this discrepancy, FCA's counsel revealed that the extended warranty list it had provided in response to the Court's Order omitted VINs of FCA's most popular vehicle, the Jeep Grand Cherokee. *Id.* ¶ 11. FCA's counsel blamed this oversight on a third-party vendor. *Id.* But even a cursory pre-production review of the list by FCA's counsel against a list of the make and model-years of the Class Vehicles would have revealed this significant omission. In any event, on November 21, FCA produced its ***fourth*** spreadsheet relating to Class Member data, which listed approximately 357,000 vehicles—still at least 200,000 fewer vehicles

than FCA had included on the prior list of purported current registrations. *Id.* ¶ 12.

As a result of this steady flow of discrepancies and contradictions, Plaintiffs could not discern if FCA had "provid[ed] to Class Counsel the VIN numbers for Class Vehicles" in compliance with the Court's Order. *Id.* ¶ 13. Accordingly, following FCA's last disclosure, and unable to rely on FCA's counsel's representations, Plaintiffs concluded that the only way to secure accurate information on the Class Vehicles was to subpoena every authorized FCA dealer in Florida to request documents and information disclosing the VINs of every FCA Class Vehicle sold or leased in the state. *Id.*; Declaration of John Gravante, attached as **Exhibit B**, at ¶ 4. Plaintiffs intended to cross-reference the information obtained from the dealerships with the various FCA spreadsheets. Neary Decl. ¶ 13. In late November and early December 2023, Plaintiffs issued subpoenas to 94 authorized FCA dealerships in Florida and began communicating with some dealerships' counsel to negotiate the production of responsive data. Gravante Decl. ¶¶ 6-8.

On November 28, 2023, during the parties' conferral on the substance of their respective motions *in limine*, Plaintiffs' counsel informed FCA's counsel that Plaintiffs would seek to exclude any reference to the aggregate Class damages because the class size had not yet been calculated due to FCA's inability to identify used car sales and resolve the outstanding discrepancies in the data it had produced. Neary Decl. ¶ 14.

On December 7, 2023, exactly four months after the Court ordered production of the data, FCA's counsel informed Plaintiffs' counsel for the first time that FCA

could, in fact, identify used car sales and leases from its authorized dealers. *Id.* ¶ 15. According to FCA's counsel, the FCA employee in charge of managing the relevant data had suddenly realized after four months and numerous requests that his team was "wrong" about FCA's access to used-car sales data. *Id.* At the same time, FCA's counsel reported that the last spreadsheet FCA had provided on new car sales and leases was deficient because, like the extended warranty list that omitted data about Grand Cherokees, that spreadsheet on new car sales omitted sales and leases of Chrysler minivans. *Id.* ¶ 16. Again, a simple pre-production review of the spreadsheet by counsel would have revealed this omission and avoided further delay.

FCA's counsel finally produced an updated new car sale spreadsheet and a used car sale spreadsheet on December 7, 2023—**four months** after the Court-ordered disclosure deadline. *Id.* ¶ 17. The Claims Administrator reviewed the spreadsheets and identified approximately 4,500 additional Class members whose data FCA had not timely disclosed. *Id.*

Days later, after reviewing documents produced by just four authorized dealerships of the 94 subpoenaed, Plaintiffs' counsel discovered approximately 172 ***additional*** Class Vehicles that FCA had not disclosed in any of the many spreadsheets produced to Plaintiffs. Gravante Decl. ¶ 8. Should these omissions be representative of all dealerships, there could be thousands of Class members FCA has still failed to disclose.

## I.     THE COURT SHOULD COMPEL FCA TO PRODUCE ITS DATA MANAGER FOR DEPOSITION.

Plaintiffs have diligently sought from FCA the accurate Class data this Court

6

ordered it to produce four months ago. The data FCA has provided to date, however, is rife with omissions, inconsistencies, and contradictions, such that Plaintiffs cannot rely on it with any confidence. Indeed, as of the date of this Motion, and only after undertaking the task of subpoenaing and reviewing documents from authorized dealerships, Plaintiffs' counsel knows *for a fact* that the data FCA has provided is materially incomplete. Accordingly, on December 7, 2023, Plaintiffs requested that FCA produce for deposition the head of its data management department and any other FCA employees who assisted in compiling the incomplete and conflicting spreadsheets produced to Plaintiffs to testify regarding the methods and sources used to gather the data and to also test the accuracy of the data. FCA flatly refused to produce any such witnesses. Plaintiffs now move to compel FCA to produce these employees for deposition.

Accurate determination of the class size and identification of its members is important, among other reasons, to ensure adequate class notice. Rule 23, therefore, authorizes courts to compel defendants to produce class identification information in their possession. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 354, 98 S. Ct. 2380, 2391, 57 L. Ed. 2d 253 (1978) ("Rule 23(d) . . . authorizes a district court in appropriate circumstances to require a defendant's cooperation in identifying the class members to whom notice must be sent."); *see also, e.g., Farley v. Lincoln Benefit Life Co.*, 2023 WL 7277253, at *2 (E.D. Cal. Nov. 1, 2023) (assigning task of class member identification to defendant, where "defendant unilaterally ha[d] the information necessary to contact absent class members"); *Baehr v. Creig Northrop*

*Team, P.C.*, 2015 WL 897759, at *8-9 (D. Md. Mar. 2, 2015) (defendant bore burden of producing class list where it had control of relevant records).

The Court's "broad discretion to manage class actions" also empowers the Court to compel depositions that will facilitate class action proceedings. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1266 (11th Cir.), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431, 211 L. Ed. 2d 254 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022) (district court did not abuse discretion in imposing requirements on class action objectors, including ordering depositions, in part because "depositions are a normal part of litigation").

Here, four months after this Court ordered FCA to "provide Class Counsel the VIN numbers for Class Vehicles and the mailing lists for the extended warranty for the Class Vehicles," FCA still has not provided Plaintiffs' counsel a list that includes all Florida Class members. Though identification of each and every Class member is not necessarily required to provide adequate class notice, and Class Counsel are confident that they have issued overbroad individual and publication notice to the Florida Class, FCA's counsel's misrepresentations about the availability of and FCA's access to Class member data, FCA's omission of data for certain categories of Class Vehicles (e.g., used vehicles, Grand Cherokees, and minivans), and Plaintiffs' recent discovery of Class Vehicles that FCA **never** disclosed, leave in question the reliability and integrity of FCA's data and the methodology and procedures used by FCA's counsel to identify and collect it.

Accordingly, to ensure the accuracy of any Class data that FCA might seek to

disclose at trial and confirm the adequacy of Class Counsel's broad and far-reaching Class notice, the Court should compel the deposition of witnesses with knowledge of the collection of the relevant Class data.

## II.   PLAINTIFFS ARE ENTITLED TO FEES AND COSTS FROM FCA AND ITS COUNSEL FOR VIOLATION OF THIS COURT'S ORDER.

On August 7, 2023, this Court ordered FCA to provide VINs for all Class Vehicles. FCA and its counsel should be held accountable for directly and repeatedly violating that order.

"District courts have broad authority and discretion to fashion sanctions against parties who fail to engage in discovery . . . or otherwise disobey court orders." *United States v. Twenty-Nine Pre-Columbian & Colonial Artifacts from Peru*, 695 F. App'x 461, 465 (11th Cir. June 2, 2017). "Besides rule-based and statutory authority, a court has inherent authority to sanction a lawyer or party for litigation misconduct." *Jones v. Life Care Centers of Am., Inc.*, 2022 WL 4389727, at *31 (M.D. Fla. Aug. 11, 2022) (citing *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006)). "The Court's inherent power is derived from the Court's need to manage its own affairs so as to achieve the orderly and expeditious disposition of cases." *Landfall 2, Inc. v. Datascore-Al, LLC*, 2022 WL 17815491, at *5 (S.D. Fla. Decl. 15, 2022) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)) (cleaned up). "A court's inherent power extends to a full range of litigation abuses and must continue to exist to fill in the interstices." *Id.* (same).

Federal Rule of Civil Procedure 16(f) further empowers the Court to "issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii), if a party or its

attorney . . . fails to obey a scheduling or other pretrial order."[3] Fed R. Civ. P. 16(f)(1)(C). Rule 16(f) also expressly commands district courts to order the disobedient "party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2) ("[T]he court ***must*** order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule . . .") (emphasis added).

"The sanctions contained in Rule 16(f) were designed to punish lawyers and parties for conduct which unreasonably delays or otherwise interferes with the expeditious management of trial preparation." *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985). "[A] district court need not make a finding of bad faith before [imposing Rule 16(f) sanctions]." *Id.* (citing *Giovanno v. Fabec*, 804 F.3d 1361, 1366 n.5 (11th Cir. 2015)). In fact, "[s]anctions under Rule 16(f) "are appropriate for negligent failure to comply with court orders." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2021 WL 1739293, at *3 (S.D. Fla. May 3, 2021). And, "[a]lthough not expressly required by Rule 16(f), in deciding whether to impose sanctions, the Court can look to whether the conduct in question is part of a pattern of behavior." *Id.*

Courts routinely award fees and costs arising from conferrals, motion practice,

---

[3] The subsections of Federal Rule of Civil Procedure 37(b)(2)(A) incorporated into Rule 16(f) authorize specific sanctions against a noncompliant party, including, but not limited to, striking pleadings, entering a default judgment, and treating as contempt of court the failure to obey any court order. Fed. R. Civ. P. 37(b)(2)(A)(ii)-(vii).

and other labor necessitated by an opponent's noncompliance with pretrial orders pursuant to Rule 16(f). *See, e.g.*, *Karpel v. Knauf Gips KG*, 2022 WL 17343845, at *4 (S.D. Fla. Nov. 30, 2022) (exercising discretion afforded by Rule 16(f) to "assess against Plaintiffs' counsel reasonable attorney's fees for the time Defendants' counsel spent attempting to confer with Plaintiffs' counsel"); *Landfall 2*, 2022 WL 17815491, at *7 (awarding fees and costs under Rule 16(f) in connection with motion to compel); *Poschmann v. R.L.R. Invs., LLC*, 2021 WL 3288191, at *1 (M.D. Fla. Aug. 2, 2021) (awarding plaintiff's counsel reasonable attorney's fees and costs associated with its efforts at obtaining compliance with court order); *RLI Ins. Co. v. Choctaw Cnty. Pub. Bldg. Auth.*, 2005 WL 2233070, at *6 (S.D. Ala. Sept. 12, 2005) (awarding fees and costs for adversary's noncompliance with court order).[4]

Sanctions and fee awards are particularly appropriate where, as here, a party's counsel has failed to carefully monitor and oversee its client's investigation, collection, and production of relevant documents and information. *See, e.g.*, *Hyde Park Storage Suites Daytona, LLC v. Crown Park Storage Suites, LLC*, 2021 WL 8825133, at *3 (M.D. Fla. Decl. 29, 2021), *report and recommendation adopted in part,*

---

[4] Courts also routinely sanction parties and their counsel for noncompliance with court orders under the analogous provision in Rule 37(b)(2)(C), awarding fees and costs for unnecessary time spent preparing motions to compel and the untimely production of responsive discovery, among other things. *See, e.g.*, *Wyndham Vacation Ownership, Inc. v. Montgomery L. Firm, LLC*, 2020 WL 3512121, at *3 (M.D. Fla. June 29, 2020) (ordering defendant to pay "reasonable expenses, including attorneys' fees" incurred in bringing motions to compel and for contempt and sanctions); *Nazer v. Five Bucks Drinkery LLC*, 2018 WL 936053, at *3 (M.D. Fla. Feb. 16, 2018) (ordering attorneys' fees arising from motions to hold Plaintiffs in contempt); *Palacios*, 2013 WL 12152424, at *1 (awarding reasonable fees for untimely production of court-ordered discovery).

*rejected in part on other grounds*. 2022 WL 2132652 (M.D. Fla. Mar. 17, 2022) (awarding fees and costs for attorneys' failure to meet discovery oversight obligations). To be sure, attorneys have a duty to do more than just ask their clients for responsive data and fall short of their professional obligations if they do not provide "the necessary advice, assistance, and supervision in searching, collecting, and producing discovery." *Id.* ("Attorneys have a duty to oversee their clients' collection of information and documents, especially when electronically stored information is involved, during the discovery process.") (cleaned up); *Equal Emp. Opportunity Comm'n v. M1 5100 Corp.*, 2020 WL 3581372, at *2 (S.D. Fla. July 2, 2020) ("It is clear to the Court that an attorney cannot abandon his professional and ethical duties imposed by the applicable rules and case law and permit an interested party or person to 'self-collect' discovery without any attorney advice, supervision, or knowledge of the process utilized.").

Plaintiffs' counsel has dedicated substantial time and incurred significant expenses pursuing undisclosed Class data, subpoenaing 94 authorized FCA dealerships, conferring and negotiating objections with dealerships' counsel, reviewing data produced by the dealerships, and preparing its motion for supplemental class notice and this motion to compel and for sanctions. *See* Neary Decl. ¶¶ 5-17; Gravante Decl. ¶¶ 4-9. Plaintiffs' counsel is entitled to recover those fees and expenses, which arose directly from FCA's noncompliance with this Court's August 7th Order and its otherwise dilatory conduct.

This Court should also consider FCA's conduct when resolving Plaintiffs'

motion *in limine* to prohibit reference at trial to any estimation of the Class size or aggregate amount of Class damages (*i.e.* the "sum" of the per-vehicle damages award as applied to the entire Class). *See* Plaintiffs' Mot. in Limine [D.E. 254] at 25-29.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court order FCA to produce for deposition its data manager and any other employee(s) responsible for gathering the Class member data provided to Plaintiffs' counsel, award Plaintiffs' counsel the attorneys' fees and costs incurred as a result of FCA's violations of this Court's Order, and prohibit FCA from introducing evidence of the Class size and aggregate damages at trial.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1(a)(3), on December 7-8, 2023, via email, counsel for Plaintiff conferred with FCA in a good faith effort to resolve the issues raised in this motion.  Counsel for FCA represented that FCA opposes the relief sought with this motion.

Dated: December 22, 2023.

Respectfully submitted,

| | |
|---|---|
| */s/ Benjamin Widlanski* | Peter Prieto, Esq. |
| Benjamin Widlanski, Esq. | Florida Bar No. 501492 |
| Florida Bar No. 1010644 | pprieto@podhurst.com |
| bwidlanski@kttlaw.com | John Gravante, III, Esq. |
| Gail McQuilkin, Esq. | Florida Bar No. 617113 |
| Florida Bar No. 969338 | jgravante@podhurst.com |
| gam@kttlaw.com | Matthew Weinshall, Esq. |
| Rachel Sullivan, Esq. | Florida Bar No. 84783 |
| Florida Bar No. 815640 | mweinshall@podhurst.com |
| rs@kttlaw.com | Dayron Silverio, Esq. |
| Robert J. Neary, Esq. | Florida Bar No. 112174 |
| Florida Bar No. 81712 | dsilverio@podhurst.com |

13

| rn@kttlaw.com<br>**KOZYAK TROPIN &<br>THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Tel: (305) 372-1800/Fax: (305) 372-3508<br><br>*Counsel for Plaintiffs* | **PODHURST ORSECK, P.A.**<br>SunTrust International Center<br>One S.E. 3rd Ave., Suite 2700<br>Miami, Florida 33131<br>Tel: (305) 358-2800/Fax: (305) 358-2382<br><br>*Counsel for Plaintiffs* |
|---|---|
| George Franjola, Esq.<br>Florida Bar No. 333271<br>gfranjola@franjolalaw.com<br>**LAW OFFICE OF GEORGE<br>FRANJOLA**<br>3610 E. Fort King Street<br>Ocala, FL 34470<br>Tel: (352) 812-0462<br><br>*Counsel for Plaintiffs* | Michael A. Burger, Esq.<br>mike@litgrp.com<br>**SANTIAGO BURGER LLP**<br>2280 East Avenue<br>Rochester, NY 14610<br>Tel: (585) 563-2400/Fax: (585) 563-7526<br><br>*Counsel for Plaintiffs* |

14