UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-60432-CIV-SINGHAL

JASON NUWER, *et al.*,

      Plaintiffs,

v.

FCA US LLC f/k/a
CHRYSLER GROUP LLC,

      Defendant.

_____/

JOINT PRETRIAL STIPULATION

In accordance with the Court's August 7, 2023, Trial Order [D.E. 241] and Local Rule 16.1(d) and (e), Plaintiff Jason Nuwer and Defendant FCA US LLC f/k/a Chrysler Group LLC ("FCA") submit their Joint Pretrial Stipulation, as set forth below.

1.    **Statements of the Case**

Plaintiff's Statement

Defendant FCA manufactured and sold certain model years 2010-2018 vehicles (the Class Vehicles") with inherently defective active head restraints ("AHRs") for more than a decade. FCA developed the AHR as a safety device intended to deploy and spring forward in the event of a rear-end collision to catch the seat-occupant's head. When the vehicle's occupant-restraint sensors detect a significant rear impact, the on-board system is meant to trigger a latch-and-retainer pin mechanism holding two compressed springs in place, which then release the AHR's latch pawls and

deploy the face of the headrest forward. But FCA designed critical components of the AHR using a plastic called Polycarbonate-Acrylonitrile Butadiene Styrene, or PC/ABS, which is susceptible to environmental-stress cracking ("ESC") when placed under pressure (i.e. the compressed springs). FCA also incorporated in the AHR's design a retainer-pin coating composed of a mixture of chemical compounds incompatible with PC/ABS plastic. Elements of the coating cause PC/ABS plastic to degrade and trigger ESC. Together, the incompatible pin coating and the constant pressure exerted by the compressed springs cause the plastic components of FCA's AHRs to snap, which results in an unintended and unexpected deployment of the AHR –*without* rear impact. FCA consumers have experienced these inadvertent or "uncommanded" deployments without any warning while driving, sitting at red lights, and while their vehicles were parked. All vehicles equipped with the defective AHRs are worth less than the premium price consumers paid for them because of this design defect.

FCA knew or should have known about the defect in the AHR's design well-before January 1, 2013. In fact, beyond basic, industry-standard knowledge regarding plastics and their relative incompatibility with certain chemical compounds, FCA had specific and significant prior experience with ESC in PC/ABS plastic. In the early 2000s, FCA replaced screws in its vehicles' instrument panels because the screws were coated with an oil that is incompatible with PC/ABS, which caused a component of the dashboard to deteriorate due to ESC. According to FCA's corporate representative, years later, a release latch on a second-row seat made of PC/ABS

2

experienced ESC when it similarly encountered an incompatible oil. Then, in 2008, during preproduction testing of the AHRs at issue in this case, two grades of PC/ABS plastic—Bayblend T65 and T85—failed in pre-production testing due to ESC. FCA's design team approved a third grade of Bayblend PC/ABS plastic, which, though it purportedly passed preproduction testing, began to fail soon after the AHRs went to market. FCA received warranty returns and consumer complaints about inadvertent deployments involving broken plastic as early as 2011. Reports by FCA customers to FCA of headrests deploying without warnings continued throughout 2012 and were flooding in by 2018 and 2019 and continue to this day, Consumers who bought FCA vehicles also reported physical injuries to FCA and the National Highway Traffic Safety Administration caused by headrests deploying without any warning but FCA ignored those reports and continued to sell Class Vehicles without either fixing the issue by replacing the Bayblend PC/ABS plastic with a stronger (and similarly priced) plastic or disclosing the defect and the concomitant risk of inadvertent deployment.

FCA did not initiate an investigation into the root cause of the inadvertent deployments until 2016, many years after it had learned of the first inadvertent deployments. During that investigation and a subsequent one a few months later, FCA never recreated or conducted an "uncommanded" deployment where the PC/ABS plastic actually cracked, even though they had the ability to conduct that type of testing. After these investigations ended, FCA waited an additional three years to issue an extended warranty that covered replacement AHRs, but only for vehicles manufactured before September of 2017 and only for those FCA customers who had

14P1716

experienced inadvertent deployments. FCA customers whose AHRs have not yet deployed were left to wait for the AHRs to deploy without warning, and to hope that the plastic restraints in their AHRs would hold. Instead of an extended warranty, the right fix or remedy for those FCA customers driving the Class Vehicles was for FCA to have issued a recall and provide AHRs without any defect to FCA customers for free.

Plaintiff Jason Nuwer purchased a 2018 Jeep Grand Cherokee from an authorized FCA dealership in Florida in 2019. The AHRs in his vehicle have not yet deployed, so Mr. Nuwer's vehicle does not qualify for FCA's extended warranty. Mr. Nuwer is pursuing a claim for violation of the Florida Unfair and Deceptive Trade Practice Act ("FDUTPA") on behalf of a class of Florida consumers who purchased or leased, and as of September 27, 2023, still owned or leased, new or used Class Vehicles from FCA US LLC-authorized dealers in Florida between January 1, 2013 and June 10, 2020. Plaintiff and the Class seek to recover the lost benefits of their bargains with FCA—the difference between the price they paid for nondefective Class Vehicles and the price they should have paid taking the defect into account.

Defendant's Statement

FCA US will present FCA US employee witnesses, introduce its internal business records at trial and present expert testimony to refute Plaintiff's claim that FCA US knew the AHRs were defectively designed with an "inferior and inexpensive form of plastic which cracks and breaks down prematurely under the constant pressure exerted by the springs in the AHR.."  First Am. Compl. at ¶¶3, 145 (ECF

14P1716

No. 10).   The evidence at trial will show that, contrary to Plaintiff's design defect allegations, a tiny fraction of a percent of AHRs developed environmental stress cracking ("ESC") and then inadvertently deployed due to a manufacturing issue at the AHR supplier, Grammer Industries.   Specifically, Grammer was introducing oil into some AHR assemblies during the manufacturing process and that oil was incompatible with certain polymers in the AHR mechanism.   This led to a small percentage (approximately .23%) of the AHRs inadvertently deploying, primarily during the 2013-2015 model years.   In August 2017 Grammer implemented process changes that eliminated the oil contamination.

FCA US did not learn of inadvertent deployments potentially occurring due to oil contamination/ESC issue until 2016.   Therefore, FCA US did not have knowledge of this issue when the first Class Vehicle was originally sold in 2009, or when the first class member purchased a vehicle in January 2013.   Finally, FCA US had no duty to disclose the fact that some AHRs were developing ESC because AHRs inadvertently deploy at a rate of less than one half of one percent  and the AHRs do not deploy with sufficient force to cause injury to a vehicle occupant's head or neck, and do not induce a startle response sufficient to present a safety risk when they do deploy.

      **A.**  **In 2010, FCA US Began Equipping Its Vehicles With AHRs To Meet The Federal Government's New Safety Regulations.**

The federal government regulates automotive safety through the National Highway Traffic Safety Administration ("NHTSA").   In this role, NHTSA is charged with developing and promulgating the Federal Motor Vehicle Safety Standards ("FMVSS").   These standards regulate a wide array of automobile components,

14P1716

ranging from airbags, to seats, to headlights.  As such, they specifically regulate head restraints, through Federal Motor Vehicle Safety Standard 202a.  202a's stated purpose is "to reduce the frequency and severity of neck injury in rear-end and other collisions."  49 C.F.R. § 571.202a (S1).  In 2007, NHTSA amended 202a, requiring automotive manufacturers to move head restraints closer to vehicle occupants' heads.  The amendment was intended to reduce the risk of whiplash injuries, and automakers had to comply with the new standard by the 2010 model year.  NHTSA gave automakers a few options for complying with the new regulation, including a static, traditional head restraint that was positioned close to occupants' heads, or an active head restraint that deployed into a position close to occupants' heads in the event of a rear impact.

FCA US had received customer data indicating that vehicle occupants— particularly women—did not like the new, closer head restraint position required by the 2010 202a amendment.  In fact, some customers found the closer head restraints so uncomfortable that they would remove their head restraint entirely.  Thus, to promote customer satisfaction and occupant safety, FCA US elected to equip its vehicles with an active head restraint, which deploys into the 202a-compliant position in the event of a rear impact collision.

## B. FCA US LLC Had No Knowledge Of Any AHR Deployments Caused By ESC When The First Class Vehicles Were Sold In 2009 Or When The First Class Member Purchased In January 2013.

FCA US had no knowledge of any AHR failure caused by ESC prior to April 2016—well after the first Class Vehicles were sold in 2009 and the first class members

14P1716

purchased their vehicles in 2013. Grammer and FCA US initiated a joint root cause investigation. On January 24, 2017, Grammer's outside testing company, Exova, issued a test report to Grammer in which it concluded that a corrosion inhibiting oil was found on the striker pin, and this oil was causing environmental stress cracks in the plastic sled, leading to failure of the sled. FCA US's materials lab conducted its own analysis and found a hydrocarbon-based material on the pins which was causing ESC. The hydrocarbon-based oil on the pin, combined with heat and other environmental factors, over time caused fractures in the sleds of a small number of AHRs, leading to inadvertent deployment.

The striker pin specification, however, made clear that it should be free of oil. And EPS, the pin supplier, confirmed to Grammer that its processes were oil free, which may well explain why ESC did not occur during pre-production testing.

### C. **The AHR Does Not Cause Injury If It Inadvertently Deploys.**

FCA US conducted many static and dynamic tests both before and after releasing the AHRs into production to determine the potential for injury, if any, associated with deployment. All testing revealed that the AHRs do not deploy with sufficient force to cause injury. The federal head injury criteria ("HIC") score attributable to AHR deployment as measured by FCA US in 2017 ranged from 0 to 1.0, with an average of 0.26—more than 99.9% lower than the federal injury assessment reference value of 500. In other words, the risk of injury from a deploying AHR was found by FCA US to be essentially zero, regardless of an individual's size or sex. These testing results were presented to FCA US senior management, which concluded that AHR deployments had no effect on motor vehicle safety. These results

14P1716

were consistent with FCA US's FMVSS 202a compliance testing, which simulates a rear-impact collision, including an AHR deployment, and with human subject testing conducted by Lars Reihart, M.D., P.E.   During the 202a compliance tests, an anthropomorphic test device ("ATD") yielded HICs well below the federal criteria of 500.   During the human subject testing, the accelerometers measured forces that resulted in HICs that were also well below the federal injury criteria.

### D. The Class Does Not Meet Rule 23's Requirements.

The Class must meet Rule 23(a) & (b)'s requirements throughout trial, until the entry of judgment.   Plaintiff's evidence is not common and does not meet Rule 23's requirements of commonality, typicality and predominance.   Furthermore, Plaintiff himself is not typical of the class and an inadequate class representative because he purchased his vehicle used.

### 2.      Basis of Federal Jurisdiction

This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"). The Court also has jurisdiction under 28 U.S.C. § 1332(d), because members of the Class are citizens of Florida and FCA has its principal place of business in, and is a corporate citizen of, Michigan.

### 3.      Pleadings Raising the Issues

The operative pleadings raising the issues are Plaintiffs' First Amended Class Action Complaint [ECF No. 10] and Defendant's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint [ECF No. 60].

### 4.      Undisposed of Motions and Other Matters Requiring Court Action

14P1716

The Court has not yet disposed of the parties' motions in limine [ECF Nos. 252, 254]; Plaintiff's Motion to Compel Deposition and for Fees Costs and Sanctions Arising from Defendant's and Its Counsel's Failure to Comply with Court Order [ECF No. 278]; and Defendant's Motion to Strike Plaintiff's Late-Disclosed Expert Report and Fact Witnesses [ECF. No. 282].

5. **Statement of Uncontested Facts Which Will Require No Proof at Trial.**

a.      In June 2019, Plaintiff Jason Nuwer purchased a certified pre-owned 2018 Jeep Grand Cherokee from Rob Lambdin's University Dodge car dealership.

b.      Mr. Nuwer's 2018 Jeep Grand Cherokee is a Class Vehicle equipped with two headrests incorporating the AHR that is the subject of this litigation.

c.      The Class Vehicles include the following FCA vehicles: 2010-2018 Dodge Journey; 2010-2011 Dodge Nitro; 2010-2012 Jeep Liberty; 2010-2017 Jeep Patriot or Compass; 2010- 2012 Dodge Caliber; 2010-2018 Dodge Caravan; 2010-2018 Town & Country; 2011-2018 Dodge Durango; 2011-2018 Jeep Grand Cherokee; 2010-2014 Sebring/Avenger; 2010-2014 Chrysler 200.

d.      FCA manufactures the Class Vehicles and installed AHRs in the Class Vehicles and distributed the Class Vehicles for sale by authorized dealerships in Florida.

e.      Grammer Industries, Inc. manufactures the AHRs for FCA.

f.      The AHRs were first used in model-year 2010 vehicles, which were manufactured in 2009.

g.      The AHRs are identical in design across the Class Vehicles.

14P1716

h.      The AHRs are component parts of the front-driver and front-passenger seats in every Class Vehicle.

i.      The AHR is a spring-activated safety system. The AHR is "set" by compressing the springs so that two latch pawls (or hooks) latch onto to a steel striker pin mounted in a sled made of PC/ABS plastic. When the AHR operates as intended, it is triggered to deploy when the vehicle's occupant restraint sensor senses a rear impact and sends a signal to release the AHR's latch pawls and deploy the face of the headrest forward.

j.      Neither AHR in Mr. Nuwer's Class Vehicle has experienced an inadvertent deployment.

k.      FCA launched an extended warranty program in June 2020, through which owners of vehicles with AHRs built before September 2017 receive a free AHR replacement or reimbursement if their AHR inadvertently deploys.

l.      FCA extended the Class Vehicle warranty to ten years/unlimited miles from the date of original purchase.

**6.      Statement of Issues of Fact Which Remain to Be Litigated at Trial.**

a.      Whether the AHR is defective in its design.

b.      Whether FCA knew[1] that the AHR was defective prior to January 1, 2013.

---

[1] It is Plaintiff's position that a FDUTPA violation does not require "knowledge." *See Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011) (J. Huck) ("The Court finds that FDUTPA does not require Weather Shield to have subjective knowledge of alleged defects in order for Gavron to state a viable FDUTPA claim"); *Rife v. Newell Brands, Inc.*, 632 F. Supp. 3d 1276, 1313 (S.D. Fla. 2022) (J.

14P1716

    c.      Whether FCA approved an AHR design that used PC/ABS plastic with an incompatible pin coating.

    d.      Whether Plaintiff and the Class members suffered economic losses due to the defect.

    e.      Whether FCA was engaged in the conduct of trade or commerce with regard to the Class Vehicles.

    f.      Whether FCA's sale and leasing of the Class Vehicles without disclosing the defect or the risk of inadvertent deployment constitutes a deceptive or unfair trade practice in the course of trade or commerce under FDUTPA.

    g.      Whether FCA's sale and leasing of the Class Vehicles caused the Class to suffer actual damages.

**7.      Concise Statement of Issues of Law on Which There Is Agreement.**

    a.      Plaintiff has asserted a claim under FDUTPA (Fla. Stat. § 501.204(1)), against FCA. *See* First Amended Complaint ECF No. 10 ¶¶ 141-155.

---

Altman) ("As a preliminary matter, FDUTPA plainly doesn't require plaintiffs to plead knowledge."); *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1233 (S.D. Fla. 2021) (J. Ruiz) (same).

Nor does Plaintiff agree that whether FCA "knew" that the AHR was defective refers to FCA having "actual knowledge." Plaintiff has plainly alleged throughout his complaint that FCA had constructive knowledge of the defect. *See e.g.* FAC ¶¶ 36, 80, 81, 90, 91, 148 ("Chrysler knew or should have known that its conduct violated FDUTPA"). So, to the extent that the Court has ruled that there is a knowledge requirement of the FDUTPA claim, Plaintiff contends that this issue should be: "Whether FCA knew or should have known that the AHR was defective prior to January 1, 2013."

14P1716

b.      An objective test is employed under FDUTPA in determining whether the practice at issue was likely to deceive a consumer acting reasonably. To establish a defective act or unfair practice, that is, the plaintiff must show that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Carriuolo v. Gen. Motors Corp.*, 823 F.3d 977, 983-84 (11th Cir. 2016).

c.      A party asserting a FDUTPA deceptive practice claim need not show actual reliance on the representation or omission at issue.

d.      Under FDUTPA, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

e.      "FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Carriuolo*, 823 F.3d at 986

f.      FDUTPA damages are incurred and measured at the point of sale.

**8.      Issue of Law That Remain for Determination by the Court.**

No issues of law remain for the Court's determination other than those raised in the motions still pending before the Court, or any issues of law that may arise during trial.

14P1716

9. **Each Party's List of Trial Exhibits That may be Offered at Trial[2]**

Plaintiff's Exhibit List attached as Exhibit A.

Defendant's Exhibit List attached as Exhibit B.

10. **Each Party's Numbered List of Trial Witnesses**

Plaintiff's Witness List attached as Exhibit C.

Defendant's Witness List attached as Exhibit D.

11. **Estimated Trial Time**

The parties estimate that they will require 10 days for trial.

12. **An estimate of each party as to the allowable maximum amount of prevailing-party attorneys' fees.**

To be determined after trial.

The parties' proposed Jury Instructions and Verdict Forms are attached hereto as Exhibits E and F.

**Dated: January 9, 2024**

Benjamin Widlanski, Esq.
Florida Bar No. 1010644
bwidlanski@kttlaw.com
Gail McQuilkin, Esq.
Florida Bar No. 969338
gam@kttlaw.com
Rachel Sullivan, Esq.
Florida Bar No. 815640
rs@kttlaw.com

*/s/ Dayron Silverio*
Peter Prieto, Esq.
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III, Esq.
Florida Bar No. 617113
jgravante@podhurst.com
Matthew Weinshall, Esq.
Florida Bar No. 84783
mweinshall@podhurst.com

---

[2] Certain of the parties' objections to the exhibit list cite to the Federal Rules of Evidence instead of the S.D. Fla. Local Rules abbreviations (e.g. "801/803" instead of "H" for a hearsay objection).

13

14P1716

Robert J. Neary, Esq.
Florida Bar No. 81712
rn@kttlaw.com
**KOZYAK TROPIN &**
**THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

*Counsel for Plaintiff and the Class*

George Franjola
Florida Bar No. 333271
gfranjola@franjolalaw.com
**LAW   OFFICE   OF   GEORGE**
**FRANJOLA**
1740 SE 18th Ave., Suite 901
Ocala, FL 34471
Tel: (352) 812-0462

*Counsel for Plaintiff and the Class*

Scott M. Sarason
Florida Bar No. 0394718
ssarason@rumberger.com
Michael R. Holt
Florida Bar No. 0483450
mholt@rumberger.com
**RUMBERGER, KIRK & CALDWELL**
A Professional Association
Brickell City Tower, Suite 3000
80 S.W. 8th Street
Miami, Florida 33130-3037
Tel. (305) 358-5577
Fax (305) 371-7580

*Counsel for Defendant FCA US LLC*

Dayron Silverio, Esq.
Florida Bar No. 112174
dsilverio@podhurst.com
**PODHURST ORSECK, P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2700
Miami, Florida 33131
Tel: 305-358-2800
Fax: 305-358-2382

*Counsel for Plaintiff and the Class*

Michael Burger, Esq. (admitted *pro hac vice*)
mike@litgrp.com
**SANTIAGO BURGER LLP**
2280 East Avenue
Rochester, New York 14610
Tel: (585) 563-2400
Fax: (585) 563-7526

*Counsel for Plaintiff and the Class*

Fred J. Fresard
Ian K. Edwards
Admitted Pro Hac Vice
**KLEIN THOMAS & LEE**
101 W. Big Beaver Rd., Suite 1400
Troy, MI  48084
(248) 509-9271
Fred.Fresard@kleinthomaslaw.com
Ian.Edwards@kleinthomaslaw.com

*Counsel for Defendant FCA US LLC*

14P1716